W. P. RICHARDSON et al., *Appellants,* v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellee.*

No. 18,305.

SYLLABUS BY THE COURT.

1. TRESPASSER—*On Railroad Train—In Dangerous Situation—Duty of Conductor.* If the conductor of a freight train knows that a trespasser riding upon one of the cars is in a situation in which his safety would be imperiled by the continued movement of the train and that he is not able to protect himself it is the conductor's duty to take reasonable precautions to avoid the threatened injury, and an omission to do so indicates that indifference to consequences which is designated as wantonness.

2. ——— *Evidence—Does Not Show Conductor Acted Wantonly.* The evidence examined and held that the conductor of one of the defendant's freight trains did not act wantonly in failing to stop the train to remove a boy nearly sixteen years old who was riding upon the ladder of one of the cars.

Appeal from Montgomery district court. Opinion filed July 5, 1913. Affirmed.

*Walter L. McVey,* and *O. L. O'Brien,* both of Independence, for the appellants.

*C. E. Benton,* and *W. P. Dillard,* both of Fort Scott, for the appellee; *S. H. Piper,* of Independence, of counsel.

The opinion of the court was delivered by

BURCH, J.: The plaintiffs sued for damages resulting from the death of their son, who was killed while trespassing on one of the defendant's trains. A demurrer was sustained to their evidence, judgment was rendered against them, and they appeal.

It is conceded that the defendant owed no duty to the deceased except not to injure him wantonly. The boy was nearly 16 years old, intelligent, strong, in good health, used to outdoor work, and able to earn $1.50 per day during harvesting and threshing. He lived with his parents two and one-half miles from the Le Hunt spur, which is a little more than three miles from Independence. The night before the casualty he went to the airdome in Independence with some of the neighbor boys, and then stayed all night with his grandmother, who lived in Independence. Had he taken the passenger train home the next day he would have gotten off at Le Hunt. Instead of this he climbed on the ladder of a freight car in a train of thirty-one cars which left Independence at about 7 o'clock in the morning. From Independence to Le Hunt the grade is up-grade for one and one-half miles and then down-grade for one and one-half miles. The boy's body was found a few rail lengths from the Le Hunt station house. The track at this point was somewhat rough and out of repair, and would cause freight trains to wobble when passing over it, and there were some cars standing on the siding. The conductor saw some one climb on the side of a car about the middle of the train just as it was leaving Independence. After the train passed over the grade and while it was rounding a curve the con-

ductor again saw the same person hanging to the side of the car. The train was then going at an average speed of 20 or 25 miles per hour. The ladder was of the standard size and construction. It is a common occurrence for men to climb on freight trains at Independence and ride to the top of the grade, where they can get off and on at any time, and they often get on and ride out there going to Le Hunt and get off at the top of the grade. The conductor testified that the person he saw catch the train looked like a grown man to him, that he did not see the boy in any position of peril or danger, that there was nothing to prevent the boy from holding to the ladder and riding to the next stop, and that he did not know that the boy wanted to get off. This is the substance of the evidence.

The occurrence is greatly to be deplored, and all favorable inferences which can be deduced from the evidence must be indulged for the plaintiff's benefit, but recklessness or wantonness or a willful disposition to injure the boy can not be imputed to the conductor of the train without injecting into the evidence facts which can not be found there. There was no evidence as to the boy's size and weight and consequently nothing to indicate that the conductor's impression that he was a man was not natural. The time which elapsed while the train moved a little more than three miles was at most not long. There was no evidence that the boy displayed physical weakness or exhaustion or inability to carry out any design he had in riding the car. Consequently there was no evidence that the conductor saw him in a position of peril imminent unless the train were stopped and he was removed, and from which he could not extricate himself. There was positive testimony to the contrary. There was no evidence as to the distance to the next stop, nor as to the speed of the train when passing the place where the boy's body was found. There is no basis upon which to affirm

or to deny that the train was going faster than he
anticipated. The presumption, based upon the instinct
of self-preservation and the natural disposition to avoid
injury, does not apply to the conduct of one who de-
liberately represses the instinctive promptings and
needlessly takes his chances in doing an unsafe thing,
and it would be neither fair nor candid to infer as a
solemn fact that the boy collapsed or was jolted off at
the very point nearest his ·father's house where he
would have alighted had he taken the passenger train.

There is no dispute between the parties as to the rules
of law which govern the case and which are well under-
stood. Little aid can be derived from decisions in other
cases since each one depends upon its own facts. Per-
haps one of the most apposite of those cited by the
plaintiffs is that of *Demerang v. Great Northern Ry.
Co.,* 114 Minn. 496, 134 N. W. 634. The plaintiff was
the manager of an elevator which stood adjacent to a
switch track of the defendant's road. An engine to
which box cars were attached ran upon the switch
track for the purpose of placing a car opposite the
elevator. The plaintiff climbed upon one of the cars,
and stood on top of it about three feet from the end.
A brakeman stood on the same car a few feet away.
While the engine and cars were backing at the rate
of about eight miles per hour the brakeman left the
top of the car and uncoupled those in the rear of the
plaintiff. The brakes were then set and the engine
reversed so that the uncoupled cars were kicked back.
The sudden stop threw the plaintiff to the ground. In
holding a complaint, which stated these facts, good
as against a demurrer, the court said:

"The sole question involved is whether the allega-
tions of the complaint, fairly construed, make out a
case of willful negligence. Plaintiff was a trespasser,
and the duty owed him by defendant, if it had notice
of his presence and that he was in a position of danger,
was to use reasonable care to avoid injuring him.
The allegations that the acts of defendant's servants

were willful and in reckless disregard of plaintiff's safety add nothing to the facts. But the complaint plainly states that the brakemen who had control of the movements of the engine and cars knew his position, and knew that he was ignorant of their intention to stop the cars. The complaint alleges a sudden stop when running at eight miles per hour, and we are not justified in saying that it was not negligence to fail to notify or warn plaintiff. The facts pleaded make out a case of the failure to exercise ordinary care after discovering plaintiff in a position of peril. This constitutes in law willful or wanton negligence." (p. 497.)

The inevitable result of suddenly stopping the engine would be to pitch the plaintiff off the car. The brakeman knew the plaintiff's situation, knew the plaintiff was ignorant of the action about to be taken, and although he had control of the movements of the engine and car left the plaintiff to his certain fate. The ground of liability, indifference to consequences despite knowledge that the plaintiff was in a position where he was certain to be injured by the contemplated movement of the train, is wholly absent from the present case.

The judgment of the district court is affirmed.